UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNNY MAE JOHNSON, Individually,
and as Next Friend of BRAD JOHNSON,
a protected individual,

       Plaintiffs,

v.

CASE NO. 05-71659
HON. LAWRENCE P. ZATKOFF

CITY OF DETROIT and
CITY OF DETROIT POLICE
DEPARTMENT,

       Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Detroit,
State of Michigan, on the 1st day of November, 2007.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment (Docket #12). In response to the Court's Order to Show Cause why Plaintiffs' case should not be dismissed for failure to prosecute, Plaintiffs have filed a response. Defendants have since replied. The Court finds that the facts and legal arguments pertinent to Defendants' Motion are adequately presented in the parties' papers, and the decisional process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED.

1

## II. BACKGROUND

On May 4, 2002, Brad Johnson (hereinafter, "Mr. Johnson") was beaten up at a rental property he owned in the City of Detroit. Mr. Johnson was beaten up by family members of a girl who claimed that Mr. Johnson had inappropriately touched her. The girl was the 16-year old daughter of a tenant at the rental property. When Detroit Police Department ("DPD") officers arrived on the scene at approximately 12:35 p.m., they placed Mr. Johnson under arrest for allegedly sexually molesting the girl. In their Preliminary Complaint Reports, two of the arresting officers, Sophia Devone and Baron Coleman ("Officer Coleman"), noted that Mr. Johnson had a scratch on his nose, appeared uninjured, made no complaints of injury and refused medical treatment for the scratch. Johnny Mae Johnson ("Mrs. Johnson"), the wife and next friend of Mr. Johnson, stated in her deposition that when she arrived at the scene (after Mr. Johnson had been beaten and was being arrested), she observed Mr. Johnson being held up by two officers in a manner to keep him from falling. She also testified that Mr. Johnson had blood coming from the bridge of his nose and looked like he was "kind of out of it" or "didn't know where he was."

Mr. Johnson was taken from the scene to the 4th Precinct. He was processed and placed in a holding cell at approximately 12:50 p.m. Officers at the 4th Precinct found Mr. Johnson slumped in his cell several hours later and, at 3:58 p.m., DPD officers presented Mr. Johnson to Detroit Receiving Hospital in a comatose state. A CT scan showed an 8x10 cm left temporal parietal intracerebral hematoma, with an associated skull fracture, post traumatic. Mr. Johnson underwent surgery to relieve the pressure of pooling blood on his brain. As a result, Mr. Johnson has been rendered incapacitated and is unable to care for himself or tend to his basic needs.

Within days of Mr. Johnson's arrest, Mrs. Johnson went to the 4th Precinct to file a complaint against the officers for failing to tend to Mr. Johnson's medical needs. Mrs. Johnson asserts that an officer involved (she believed it to be Officer Coleman) approached her and said (a) "I wish I had taken him to the hospital, but I didn't," and (b) he had "passed the holding cell and

heard him [Mr. Johnson] cry out for help."

On April 27, 2005, on behalf of herself and Mr. Johnson, Mrs. Johnson filed a Complaint against the City of Detroit (the "City") and the Detroit Police Department ("DPD"), wherein Plaintiffs alleged that the Defendants deprived Mr. Johnson of his constitutional rights to medical treatment while in the custody of the DPD. Plaintiffs' state law claims alleging (1) Failure to Properly Hire, Train and Supervise, and (2) Assault and Battery previously were dismissed by the Court, without prejudice.

### III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the

motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. ANALYSIS

Plaintiffs assert claims against Defendants for (1) cruel and unusual punishment in violation of the Eighth Amendment, and (2) violation of his due process rights under the Fourteenth Amendment.

**A.  Eighth Amendment Claim**

As to Plaintiffs' claim of an Eighth Amendment violation, the Court notes that the Eighth Amendment does not apply to pre-trial detainees. *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979); *Ingraham v. Wright*, 430 U.S. 651 (1977); *Barbar v. City of Salem*, 953 F.2d 232 (6th Cir. 1992). In this case, Mr. Johnson was never prosecuted for the underlying alleged criminal acts and, as such, was never found guilty and confined as a result of such guilt. Accordingly, the Court summarily dismisses Plaintiffs' Eighth Amendment claim.

**B.  Fourteenth Amendment Claim**

With respect to Plaintiffs' Fourteenth Amendment Due Process Claim, the Court first recognizes that it must consider the factual allegations in a light most favorable to Plaintiffs. Therefore, it is irrelevant that there are clearly genuine issues of material fact regarding Mr. Johnson's condition at the time DPD officers arrived at the rental property and at the time Mr. Johnson was processed at the 4th Precinct. Instead, the Court must assume that Mrs. Johnson's description of Mr. Johnson's condition (the bleeding on his nose, his inability to stand on his own and his general lack of awareness as to his situation) was accurate and that Mr. Johnson's condition and need for medical treatment was obvious to each of the arresting, processing and turnkey officers. In addition, for purposes of deciding the instant Motion, the Court assumes, without deciding, that Mr. Johnson had a constitutionally protected right under the Fourteenth Amendment Due Process

4

Clause to the method and manner of medical treatment he asserts in his Complaint.

In this case, Plaintiffs have not sued any individuals. Plaintiffs have brought suit only against the City.[1] Nonetheless, Plaintiffs argue that various individuals failed to provide Mr. Johnson with medical treatment when he needed it. Even if such allegations are true, however, the mere inaction of individual officers does not render the City liable for any resulting deprivation of Mr. Johnson's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 394 (1989). The law is well established that a municipality can be held liable for the violation of a constitutionally protected right only if the plaintiff can establish that an officially executed policy, or the toleration of a custom by such municipality leads to, causes, or results in the deprivation of such rights. *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996). Neither *respondeat superior* nor vicarious liability is available as a theory of recovery in a §1983 action. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

Therefore, in order to have a viable action against the City, Plaintiffs must demonstrate that the City itself was the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992). In order to do so, Plaintiffs must (1) identify the policy, (2) connect the policy to the City, and (3) show causation between the particular injury and the execution of that policy. *Garner v. Memphis Police Dept.,* 8 F.3d 358, 364 (6th Cir. 1993) (on remand). *See also Harris*, 489 U.S. at 385 (the "first inquiry in any case alleging municipal liability under §1983 is . . . whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). In some instances, however, it is possible that a "custom," rather than a policy, may be sufficient to subject a municipality to liability. *See, e.g., Monell*, 436 U.S. at 690-91, wherein the Supreme Court stated:

> [A]lthough the touchstone of the §1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other §1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to

---

[1] The DPD is a subdivision of the City. The DPD is not itself a legal entity subject to liability. *See O'Leary v. Marquette Bd. of Fire and Water Comm'rs*, 79 Mich. 281 (1890); *Pierzynowski v. Police Dept. of Detroit*, 941 F.Supp. 633 (E.D. Mich. 1996). Accordingly, the City is the only proper defendant in this case

5

governmental "custom" even though such custom has not received formal approval through the body's official decisionmaking channels.

In this case, the Court finds that Plaintiffs have not set forth facts to support a finding that there is a specific *policy* of the DPD that led to the alleged failure to get medical treatment for Mr. Johnson. Significantly, Plaintiffs acknowledge that "it is the stated policy of the City of Detroit under general orders that any person displaying any signs of injury must be transported to Detroit Receiving Hospital for medical treatment." Accordingly, the Court finds that the stated policy of the DPD requires officers to take exactly the action Plaintiffs allege was not taken. The fact that the individual officers allegedly did not follow the policy does not diminish or overcome the fact that such a policy was in place.

Plaintiffs argue that although the "stated policy [is to get medical treatment for a person displaying signs of injury], it is not the *custom or practice* of the" DPD to do so (emphasis added). Plaintiffs further argue that the City was deliberately indifferent or grossly negligent with respect to the constitutional rights of citizens, namely Mr. Johnson, because it failed to provide more or different training for its officers, despite the City's knowledge that DPD officers did not get medical treatment for prisoners and detainees in accord with the policy. Plaintiffs also assert that the officers' failure to get medical treatment for Mr. Johnson was "symptomatic rather than aberrational." *See Porter v. Nussle*, 534 U.S. 516, 530 (2002) ("An unwarranted assault by a corrections officer may be reflective of poor hiring practices, inadequate training or insufficient supervision").

Plaintiffs first direct the Court to deposition testimony of Lieutenant Michael Hinton and Officer Coleman. At his deposition, Lieutenant Hinton stated:

> Q: In 2002 can you give me the policy and procedure for processing a prisoner or person arrested that is injured?
>
> A: If the injury is known, the prisoner is conveyed directly from the scene, from the arrest point, to a medical center, Detroit Receiving, Henry Ford, whatever is available, if the injury is known at the point of arrest. If the injury or illness occurs during the person's time in the detention area, they are conveyed at that time immediately to a medical facility.

6

At his deposition, Officer Coleman stated:

> Q. What is your knowledge of the policy and procedure in 2002 for handling injured prisoners?
>
> A. 2002?
>
> Q: Yes.
>
> A: The date of this incident, that period?
>
> Q: Yes.
>
> A. That was 2002. The policy has always been the same, where you have an injured prisoner, you get the medical treatment. If they refuse medical treatment and the injury is not severe, they have the right to do that. If it's severe you must get them medical treatment. There is no way around it.

Plaintiffs also direct the Court's attention to several documents which Plaintiffs believe demonstrate (a) the failure of DPD officers to get medical treatment for prisoners and detainees and that such failure constitutes a custom or practice of DPD officers, and (b) the City's deliberate indifference to that custom or practice:

1. A December 14, 2001, Report from the Law Department and Risk Management Task Force, which includes the following passage:

    > The Police Department Risk Management Staff have been studying prisoner detention and deaths in custody. Most deaths in custody occur because medical intervention was not received.

2. An April 4, 2002, letter from the U.S. Department of Justice, Civil Rights Division ("DOJ"), which identifies deficiencies in the existing and proposed DPD policies and procedures for providing medical care to prisoners or detainees, as well as the failure of officers to apply the policy as written.

3. A Consent Judgment entered on July 18, 2003, regarding "Conditions of Confinement," which included the following language:

    > This Agreement is effectuated pursuant to the authority granted the DOJ . . . to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges or immunities secured by the Constitution or federal law.
    >
    > In its Complaint, the United States alleges that the City and the DPD are engaging in a pattern or practice of unconstitutional or otherwise unlawful conduct that has been made possible by the failure of the City and the DPD to adopt and implement proper management practices and procedures.

7

> * * * *
>
> > Based in part on these requests, the DOJ initiated an investigation in December 2000, of the use of force and conditions in DPD holding cells . . . The investigation was expanded in May 2001, to include the DPD's arrest and detention policies and practices.
> >
> > * * * *
> >
> > During the investigation, in keeping with the Attorney General's pledge to provide technical assistance, the DOJ made recommendations for changes in the DPD's policies and procedures regarding . . . conditions in DPD holding cells, . . ."

The Court does not agree that the foregoing testimony and documents support Plaintiffs' contentions.

First, the Court finds nothing in the statements of Lieutenant Hinton and Officer Coleman to suggest that (a) the actual custom of DPD officers was to do anything other than get medical treatment for a prisoner who is injured, or (b) the City was deliberately indifferent to the medical needs of prisoners and detainees because the City did not provide more or different training to DPD officers. Second, the December 14, 2001, Report is not a record kept in the ordinary course of business by the City. In fact, the Report is not a City record at all. Moreover, the Report was authored in 2001 by a part of "Mayor-Elect" Kwame Kilpatrick's Transition Team, prior to Mayor Kilpatrick taking office. As such, the persons involved in preparing the report were not City employees. More significantly, the two sentences in the Report cited above and relied upon by Plaintiff constitute a conclusory statement. In reviewing the Report, the Court finds no supporting evidence (or even any context) for that conclusion. In addition, the foregoing language does not indicate (expressly or implicitly) that the need for medical intervention was recognizable or should have been recognized by officers, nor does it attribute the deaths to wrongful action or inaction by DPD officers.

Third, the Consent Judgment, at least as provided to the Court, includes nothing that demonstrates that the City or the DPD allowed or ratified a custom that involved officers failing to get adequate medical treatment for prisoners or detainees. At most, the language in the Consent

Judgment states that the DOJ's "investigation was expanded to include the DPD's detention policies and practices" and that "the DOJ made recommendations for changes in the DPD's policies and procedures regarding . . . conditions in DPD holding cells." Neither of these ideas reflect any concerns about medical treatment.

Fourth, the April 4, 2002, letter from the DOJ reached a number of conclusions based on, among other things, interviews the author (or someone else) conducted with some DPD officers and two site visits to DPD precinct stations. The interviews and site visits, however, occurred at least 8 months prior to the date of the letter. Significantly, nothing in the DOJ letter identifies any incidents where officers failed to apply the policy as written. The letter also does not identify any of the officers interviewed, nor does it specify the regularity with which officers allegedly failed to apply the policy as written. In addition, nothing in the DOJ letter even hints that officers in the 4th Precinct failed to apply the policy as written, nor does the DOJ identify any persons who failed to receive necessary medical treatment as a result of the alleged failure of DPD officers to medically intervene.

Finally, the DOJ letter includes the following statement: "important aspects of our investigation have yet to be completed, most notably reviewing the documents regarding incidents in the holding cells and precinct contingency plans that establish emergency procedures." As the investigation had not been completed when the DOJ letter was written, the Court finds that it would be pure speculation to conclude, as Plaintiffs have, that the DOJ's investigation would result in a finding that the DPD had a custom of, or was deliberately indifferent to, DPD officers failing to get medical treatment for prisoners and detainees.

For the reasons set forth above, the Court concludes Plaintiffs have not demonstrated that there is a genuine issue of material fact that the policies or customs of the DPD or the City led to, caused or resulted in a deprivation of Mr. Johnson's constitutional rights. Further, the Court also concludes that Plaintiffs have not submitted evidence that the City (or the DPD) has been deliberately indifferent. Accordingly, the Court finds that Plaintiffs failed to assert a viable claim

9

against the City and GRANTS Defendants' Motion for Summary Judgment.

## V. CONCLUSION

Accordingly, and for the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED. Plaintiffs' cause of action, as set forth in Plaintiffs' Complaint is, therefore, DISMISSED WITH PREJUDICE. Judgment shall be entered accordingly.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: November 1, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on November 1, 2007.


s/Marie E. Verlinde
Case Manager
(810) 984-3290